UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PAULETTE WESTON, a single woman,

Plaintiff,

v.

BERNARD JOSEPH HARRIGAN, a single person; and CARLOS D. BENAVIDEZ and KINDA R. BENAVIDEZ, husband and wife and their marital community; and WASHINGTON STATE LIQUOR CONTROL BOARD, a Division of the State of Washington,

Defendants.

CASE NO. C08-469RSM

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff Paulette Weston filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the individual defendants unlawfully deprived her of a constitutional right. She also asserts state law claims against all defendants for negligence and for intentional interference in a contract. Dkt. # 1. All defendants have moved for summary judgment, and plaintiff has opposed the motion. The Court deems oral argument on the motion unnecessary as the matter has been well and fully briefed. For the reasons set forth below, the Court shall grant the motion for summary judgment as to the civil rights claims, and decline jurisdiction over the state law claims.

BACKGROUND

This action arises from a liquor law compliance check conducted by agents of the Washington State Liquor Control Board ("WSLCB"). Plaintiff was a longtime employee of Albertson's grocery and was working as a cashier on the night of September 29, 2005. Shortly after she returned from a break that evening, a young woman brought a bottle of wine to her register for purchase. The young woman, Louise Carey, was an agent of the WSLCB with instructions to attempt to purchase alcohol at various

ORDER - 1

stores in an attempt to test store compliance with the law regarding sales to underage persons. Ms. Carey was nineteen on that date and was instructed to use her actual driver's license in the attempted "buy." She was accompanied by two other agents, the named defendants here, who posed as unrelated customers and witnessed the transactions attempted by Ms. Carey. This was one of ten compliance checks they performed that evening. During this "buy," defendant Harrington stood in line behind Ms. Carey, and defendant Benavidez stood nearby. Plaintiff alleges that they were both acting in a disruptive and intimidating manner, moving around with "quick and agitated motions," and shuffling magazines. Complaint, ¶3.6.

When plaintiff "scanned" the bottle of wine—a Kendall-Jackson Chardonnay priced at $14.99—the register alerted her to check the customer's identification to verify age. She asked Ms. Carey for her driver's license, and Ms. Carey handed it to her. The driver's licence was a "vertical" license, the type issued by the State of Washington to persons under the age of twenty-one. This vertical license has a "portrait" format instead of the horizontal "landscape" format used for adults over the age of twenty-one. The license has three dates on it. The topmost date, just beneath the license number, is the expiration date, which in this case was 12-05-2006. Dkt. # 25, Exhibit D-2. Farther down, to the left of the photograph, is the licensee's date of birth, which in this case read "DOB 12-05-1985". Below that was the "age 21 on" date, which was 12-05-2006. *Id*. A cashier is supposed to check the expiration date of the license, verify the photograph, and then key in the date of birth into the register. The register will then verify that the customer is of legal age to purchase the alcohol, or will alert the cashier to the fact that the customer is not.

On this occasion, plaintiff verified the expiration date, confirmed the photograph, and then mistakenly keyed the birth date into the register as 12-05-06. Although the date of December 5, 2006 was actually **after** the date of the incident, making the date invalid as a date of birth, the register accepted the date because only the last two digits of the year (06) are keyed in. That is, the register read the date as December 5, 1906 instead of December 5, 2006, indicating that the customer was ninety-eight years old on September 29, 2005. As a ninety-eight-year-old customer would be of legal age to purchase the wine, the register did not alert plaintiff that Ms. Carey was underage, and plaintiff continued with the

ORDER - 2

transaction. She told Ms. Carey the amount due—$16.31 with tax included—accepted the twenty dollars she offered as payment, and returned the $3.69 in change along with the receipt. That receipt indicates that the time of the transaction was 7:21 p.m., although it actually occurred later than that, around 7:30 p.m. or later. Ms. Carey walked away from the register with the wine in hand, and left the store. She met agent Benavidez outside to hand over the wine. Defendant Harrington, who had been standing in line behind Ms. Carey, then showed plaintiff his badge and told her she had just sold alcohol to a minor.

At this point a supervisor was called over to plaintiff's register. The supervisor, Dawn Sedowsky, was shown the receipt for the transaction, and the consequences of the violation were explained. Plaintiff's register was closed down, and after she gave a statement she was sent home pending an investigation. The electronic journal for the cash register was run later, and the record matched the transaction receipt that Ms. Carey was given for the buy, including the 7:21 p.m. time. This confirmed that the register's internal clock was not set properly, accounting for the error on the time of the receipt.

Albertson's has a "zero tolerance" policy for sales of alcohol to minors. Plaintiff had previously (in 2002) sold cigarettes to a person under age, and had been informed of this policy. After the alcohol sale, plaintiff was immediately terminated from her position, and her union filed a grievance. Albertson's offered plaintiff her job back, but she declined the offer because it did not include back pay. Her termination was upheld in arbitration.

On these facts, plaintiff alleges two federal claims against the individual defendants: a claim of deprivation of her constitutional right to employment, a protected property interest; together with conspiracy to deprive her of that constitutional right. Complaint, ¶¶ IV, V. Defendants have moved for summary judgment on these federal claims on the basis of their qualified immunity. Defendants have also moved for summary judgment as to plaintiff's state law claims. These will be addressed separately.

DISCUSSION

I. Legal Standard

Summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

ORDER - 3

An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence is viewed in the light most favorable to the non-moving party. *Id.* "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F. 3d 1216, 1221 (9th Cir. 1995). It should also be granted where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to prevent summary judgment. *Triton Energy Corp.*, 68 F. 3d at 1221.

## II. Section 1983 Claims

Plaintiff's civil right claims are brought under 42 U.S.C. § 1983. In order to state a claim under § l983, a complaint must allege that (l) the defendants acted under color of state law, and (2) their conduct deprived plaintiff of a constitutional right. Section l983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. <u>Haygood v. Younger</u>, 769 F. 2d l350, l354 (9th Cir. l985)(en banc); <u>cert.</u> <u>denied</u>, 478 U.S. 1020 (l986).

Here, there is no dispute that the defendant agents acted under color of state law, so the first prong is met. As to the second prong, the constitutional right which plaintiff alleges the defendants violated is her protected property interest in continued employment. She alleges that the agents deprived her of that interest without due process of law, by employing a "sting" operation. As to this claim, defendants have raised the defense of qualified immunity.

## III. Qualified Immunity

Qualified immunity shields government actors from a suit for damages if a reasonable official could have believed that his or her conduct was lawful, in light of clearly established law and the information possessed by the official. *Anderson v. Creighton*, 483 U.S. 635, 637-39, 641 (1987). Because qualified immunity is immunity from suit, rather than "a mere defense to liability," the Court should rule on the issue early in the proceedings so that defendants avoid the costs and expenses of trial where the defense is dispositive. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Thus, at the summary judgment stage, a court necessarily decides qualified immunity if it turns on issues of law. *See Torres v.*

ORDER - 4

*City of L.A.*, 540 F.3d 1031, 1044 (9th Cir.2008).

Traditionally, in assessing whether an officer is entitled to qualified immunity, a court would first inquire whether the facts alleged, taken in the light most favorable to the plaintiff, establish a constitutional violation. *Saucier*, 533 U.S. at 200. If the court found a constitutional violation, the court would next consider "whether the right was clearly established." *Id.* at 202. This decisional sequence was recently modified by the Supreme Court, such that now the courts are "permitted to exercise . . . sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 129 S.Ct. 808, 77 USLW 4068 (2009).

With respect to law-enforcement actions by state officers, the Supreme Court has made it clear that only official conduct that "shocks the conscience" is cognizable as a due process violation. *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Whether the defendant agents committed a constitutional violation under the first step of *Saucier's* qualified immunity analysis presents two issues. First, the Court must decide the appropriate standard of culpability to apply to defendants' conduct to determine whether it "shocks the conscience" under the Fourteenth Amendment's Due Process Clause. *Lewis*, 523 U.S. at 846. Second, it must be determined whether defendants' conduct met that standard of culpability.

The Ninth Circuit Court of Appeals recently clarified the standard of culpability which would "shock the conscience" in a case such as this, in which the *Lewis* circumstances of a high-speed chase and resultant death are not present. *Porter v. Osborne*, 546 F. 3d 1131 (9th Cir. 2008). The relevant question on the facts here is whether the "shocks the conscience" standard is met by showing that the agents acted with deliberate indifference or requires a more demanding showing that they acted with a purpose to harm plaintiff for reasons unrelated to legitimate law enforcement objectives. *Lewis*, 523 U.S. at 836. The appellate court noted that "[i]n our cases following the Supreme Court's enunciation of the shocks the conscience test in Lewis, we have distinguished the "purpose to harm" standard from the "deliberate indifference" standard, recognizing that the overarching test under either is whether the officer's conduct "shocks the conscience." *Porter v. Osborne*, 546 F. 3d at 1137. Guided by *Porter*, the Court finds that here, viewing the facts in the light most favorable to plaintiff, she must demonstrate that

ORDER - 5

defendants acted with a purpose to harm her that was unrelated to legitimate law enforcement objectives. *Id.*

The actions by the agents which plaintiff identified in her complaint as depriving her of due process were random and suspicious movements which she interpreted as threatening.

> Agent Harrigan, bearded and disheveled in appearance, maintained from his position behind agent Louise Carey a continuous movement consisting of moving in and away from the attention of Weston, leaning over the area where a customer would usually write checks, made quick and agitated motions designed to detract [sic] Weston from her duty to properly test the age of Louise Carey, acting as if he were trying to catch the attention of Weston, speak to her and then withdraw before any communications ensued. He repeated the process all during the time of Weston's presence in the checker stand while Weston completed her assigned tasks as a checker, left to obtain the cigarettes and her return to complete the transaction. Agent Benavidez from his position behind Weston was intentionally grabbing and replacing magazines from a rack and making noise in the process with the intended purpose of adding to the confusion and distraction of Weston.

Complaint, ¶ 3.6. In her deposition, she explained why this bothered her:

> Q. All right. So what was unusual about Mr. Harrigan being in line behind Louise Carey?
>
> A. He was acting in a hurry and he was agitated, and I thought that he was a crack-head or a meth-head. He was picking up magazines and slamming them down, and then he'd move over here and he'd move over here, then he'd lean up like he was going to talk to me and then he'd go back.
>
> And there's a little check-writing area right here, he was leaning up on that and get the magazines that were right next to me and he'd bang them up and down. He was leering at me over his glasses and at her the whole time.
>
> Q. Did he say anything?
>
> A. No.
>
> Q. It sounds as if he was making you very uncomfortable?
>
> A. Oh yes. I thought he was going to rob me or something. He kept putting his hands in his pockets, too, and pulling them out, and I was like is he going to pull out a gun any minute here.
>
> Q. Did Louise Carey seem to know who he was?
>
> A. No. I didn't — I thought she was just afraid because he was acting that way right there, like he was going to do something bad.

Deposition of Paulette Weston, Dkt. # 26, Exhibit C, p. 13. Plaintiff also described the behavior of Agent Benavidez, stating that he was standing in the empty check stand behind her, looking at magazines. *Id*. p. 14.

ORDER - 6

Viewing these facts about the agents' behavior in the light most favorable to plaintiff, the Court finds that they do not, without more, rise to the level of conduct which "shocks the conscience." Agent Harrigan's random motions, while distracting to plaintiff, were not so threatening or egregious as to demonstrate a purposeful intent to harm plaintiff unrelated to legitimate law enforcement concerns. *Porter v. Osborne*, 546 F. 3d at 1137. Further, plaintiff has presented no evidence that defendants even knew that their "sting" operation would cause her to lose her job. Thus, even if the agents' conduct could be viewed as outrageous (which it cannot), it cannot be said that there was any purposeful intent to harm her by depriving her of her job. To the contrary, plaintiff stated in her deposition that when she told Agent Harrigan that she would be fired for selling alcohol to a minor, he responded "No, you won't. You'll get a warning." Weston Deposition, Dkt. # 26, Exhibit C, p. 5.

The balance of plaintiff's contentions supporting her claims, particularly the claim of conspiracy, are all based on conjecture and speculation. She initially alleged in her complaint that there were actually two separate "buy" attempts.

> She was approached no sooner than 7:15 PM and no later than 7:45 PM by a young female customer, twice purchasing a bottle of white wine. Upon information and belief the young female on both purchases was blond and similar in appearance to enforcement agent Louise Carey, making the same type of wine purchase each time as to color (generic white) and quantity (one bottle). . . .
>
> On the occasion of the second of the two wine purchases, Louise Carey in addition to and contrary to Defendant WLCB policies to test compliance with a single product only in such tests, requested to purchase a package of cigarettes from Weston. The tobacco inventories for sales at Albertson's were so located that Weston had to leave her checker stand to obtain the package of cigarettes and return before scanning the wine product being purchased. . . .
>
> The actual transaction in which Weston was distracted by the "sting" participants Harrigan, Benavidez and Carey took place between 7:30 and 7:45 PM and not 7:21 as reflected on the sales receipt produced.
>
> Upon information and belief, Defendants Harrigan and Benavidez acting in concert with Louise Carey made a test run at 7:21 PM without witnesses and ran it again with witnesses on which the alleged violation of law occurred and in which the cigarette sale purchase was recorded in violation of the WLCB's operating procedures for testing only a single item. The purpose of the distraction was to insure that a violation would occur.

Complaint, Dkt. # 1, ¶¶3.3, 3.5, 3.17-3.18.

The evidence produced during discovery demonstrated that the internal clock in the cash register was off, accounting for the 7:21 time on the register receipt. The electronic transaction record was run later and displayed the same time for the transaction, confirming that the internal clock was improperly

ORDER - 7

set. Plaintiff accordingly abandoned her "two purchases" assertion in opposing summary judgment, but continues to assert that the cigarette purchase and purchase time discrepancies create issues of fact which preclude summary judgment. They do not.

The complaint alleges, and plaintiff testified in her deposition, that Ms. Carey asked for a pack of cigarettes to purchase along with the wine, and that plaintiff left the check stand to go get them. Ms. Carey testified, on the other hand, that she did not ask for or purchase cigarettes. The receipt of the transaction does not indicate that cigarettes were purchased, and plaintiff cannot recall scanning the cigarettes or remember what happened to them after she retrieved them. Nevertheless, in viewing the facts in the light most favorable to plaintiff, the Court will assume (without deciding) that Ms. Carey did ask for cigarettes. The Court took this allegation, including the allegation that plaintiff was distracted by this request, into account when it concluded, above, that defendants' conduct does not "shock the conscience."

In opposing summary judgment, plaintiff has pointed to other areas in which she contends that there is a factual dispute which precludes summary judgment. As her first three contentions all relate to her theory that Louise Carey carried an altered driver's license, they shall be listed and then addressed together.

The facts which plaintiff contends are disputed are:

A. "That Louise Carey only carried her valid Washington Drivers License in the sale that was witnessed by Officers Harrigan and Benavidez." Plaintiff's Response, p. 2.

B. "That Ms. Weston in the sale transaction looked at the license and observed two different dates." *Id*., p. 4.

C. "That the 12-05-06 birth date on the sales slip was entered when the sale to Carey was witnessed by the WLCB officers." *Id*. p. 5.s

Plaintiff asserts that these facts are in dispute. She testified at her deposition that she knew she entered the "date of birth" on Ms. Carey's license into the register because she always entered the "top

ORDER - 8

date."[1] [2] Weston Deposition, Dkt. # 26, Exhibit C, p. 89. She opposes summary judgment by advancing the theory that Louise Carey showed her an altered driver's license with the date of 12-05-06 in the "date of birth" position, near the top of the license, and that this was why she entered the incorrect date into the cash register. In essence, she contends that she was tricked by an altered license.

In support of this theory, she offers the testimony of her father, Paul Weston, who created an altered driver's license for demonstration purposes. Declaration of Paul Weston, Dkt # 26, Exhibit 9. Defendants have moved in their reply to strike Mr. Weston's testimony and the exhibit. Dkt. # 27. This motion to strike is GRANTED. Mr. Weston is not qualified as an expert witness, his opinion in drivers' licenses is not based on the facts of record in this case, and is otherwise inadmissible. His demonstration of an altered driver's license is irrelevant.

Ms. Carey testified at her deposition that she carried only her actual Washington State driver's license on the compliance test. Deposition of Louise Carey, Dkt. # 25, Exhibit D, p. 16. She also specifically denied that she carried a driver's license with a "date of birth" showing 12-05-2006. *Id.*, p. 21. These statements were made under oath. Plaintiff has presented no evidence whatsoever so controvert this sworn evidence. Her conclusory allegations made on an unsupported theory are wholly insufficient to create an issue of fact on this point.

Plaintiff's remaining factual contentions regarding the transaction receipt and the electronic record from the cash register, as well as the events that occurred after the sale took place, are similarly based on speculation or innuendo, and fail to controvert or create a dispute regarding the evidence in the form of sworn testimony that defendants have presented. Plaintiff's Response, pp. 5-10. The undisputed

---

[1] At her deposition, the following colloquy took place:

Q: And you knew that the birth date was the top date and the date the person would be 21 was the bottom date?
A: Yes.
Q: Okay. Now which date did you enter?
A: I entered the top date, the date of birth.
Q: And how do you know that?
A. Because I always do. I have never entered the lower date.

Weston Deposition, Dkt. # 26, Exhibit C, p. 89.

[2] As noted above, the actual "top date" on a vertical license is the expiration date, which in this case was the same as the "age 21" date, or 12-05-06—the date that plaintiff entered into the register.

ORDER - 9

evidence in the record demonstrates that agents Harrigan and Benavidez observed plaintiff complete a transaction involving the sale of alcohol to a person under the age of twenty-one. Plaintiff asked to see a driver's license, was shown a "vertical" license which alerted her to the fact that the customer was likely to be underage, and then keyed in the wrong date from that license into the register. Even if one or both agents acted in an agitated or disruptive manner as described by plaintiff, that behavior does not rise to the level of "conscience shocking" conduct so as to constitute a deprivation of plaintiff's Fourteenth Amendment right to due process. *Lewis*, 523 U.S. at 846; *Porter v. Osborne*, 546 F. 3d at 1137. As the facts alleged, taken in the light most favorable to the plaintiff, do not establish a constitutional violation, defendants are entitled to qualified immunity on both the civil rights and conspiracy claims. *Saucier*, 533 U.S. at 200.

## CONCLUSION

The individual defendants have demonstrated that they are entitled to qualified immunity from plaintiff's § 1983 claims. Their motion for summary judgment on plaintiff's federal claims is accordingly GRANTED on that basis, and those claims are hereby DISMISSED. The Court declines supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3), and those claims are accordingly DISMISSED without prejudice.

DATED this 20th day of March 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 10